# **EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

MCALLEN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | CASE NO. 7:21-CR-603-3 |
| | § | MCALLEN, TEXAS |
| VERSUS | § | WEDNESDAY, |
| | § | MARCH 10, 2021 |
| DAISY YANNETTE SUPRISE | § | 3:23 P.M. TO 5:09 P.M. |

DETENTION HEARING (VIA VIDEOCONFERENCE)

BEFORE THE HONORABLE JUAN F. ALANIS
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:                          SEE NEXT PAGE

COURTROOM DEPUTY:                     NELIDA LOSOYA

COURT RECORDER:                       JENNIFER NOGUEIRA

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

<u>APPEARANCES (VIA VIDEOCONFERENCE)</u>:


For the United States:          U.S. ATTORNEY'S OFFICE
                                Patricia Cook Profit
                                1701 W. Business Highway 83
                                Suite 600
                                McAllen, TX 78501
                                (956) 618-8010


For Defendant Suprise:          DUARTE MOLLINA
                                Demetrio Duarte, Esq.
                                2200 Warner Avenue
                                San Antonio, TX 78201
                                (210) 737-6676


Also Present:                   LAURA IGLESIAS

3

<u>INDEX</u>

| WITNESS: | <u>Direct</u> | <u>Cross</u> | <u>Redirect</u> | <u>Recross</u> |
|---|---|---|---|---|
| Mariah Yates | | | | |
| By:  Ms. Profit | 14 | – | – | – |
| By:  Mr. Duarte | – | 21 | – | – |

| EXHIBITS: | <u>Marked</u> | <u>Offered</u> | <u>Admitted</u> |
|---|---|---|---|
| None | | | |

...

4

1          <u>MCALLEN; THURSDAY, MARCH 10, 2021, 3:23 P.M.</u>

2          THE COURT:  We are set here for a preliminary

3     detention hearing in the matter of The United States of

4     America versus Daisy Yannette Suprise, docket

5     No. 7:21-mj-387-3.

6          Announcements.  Government first.

7          MS. PROFIT:  The Government is present and ready,

8     Your Honor.

9          MR. DUARTE:  Demetrio Duarte appearing on behalf of

10    the Defendant, Ms. Suprise, and we are ready to proceed, Your

11    Honor.

12         THE COURT:  Before we go forward with the formal

13    preliminary detention hearing I need to address the issue of

14    the Garcia hearing.

15         Let me address Ms. Surprise in regards to her

16    consent for these proceedings at this time.

17         Ms. Suprise, I do need to ask you some questions

18    here under oath under penalty of perjury should you provide a

19    lie or false statement to the Court.  Therefore, if you can

20    please raise your right hand and the Clerk will place you

21    under oath.

22         (Defendant sworn.)

23         THE COURT:  You may place your hand down.

24         Is your true and correct name Daisy Yannette

25    Surprise?

1          THE DEFENDANT:  That's correct.

2          THE COURT:  And right now are you here in Court

3     under the influence of any drugs, alcohol or medication?

4          THE DEFENDANT:  No, Your Honor.

5          THE COURT:  Ms. Surprise, you do have a right to

6     actually appear in court here in McAllen for these

7     proceedings.  As you're aware because of the COVID-19 pandemic

8     we set up the video conference system.  And do you consent or

9     agree to your presence here through use of the video

10    conference system?

11         THE DEFENDANT:  I consent.

12         THE COURT:  And Mr. Duarte, any objection to these

13    proceedings?

14         MR. DUARTE:  No, sir.

15         THE COURT:  I do note there's no objection to these

16    proceedings and Ms. Surprise has consented to these

17    proceedings and they are allowed under the Federal Rules of

18    Criminal Procedure as well pursuant to General Order Number

19    2020-27, issued under the CARES Act in light of the COVID-19

20    pandemic to ensure everybody's safety in the interest of

21    justice and allow the Court to continue to function at this

22    time.

23         We are formally set here for a preliminary detention

24    hearing, but before we get to that I know both parties have

25    filed motions in regards to the request for a Garcia hearing

6

1    by the Government at the last hearing.

2          Mr. Profit, do you want to address your motion at

3    this time?

4          MS. PROFIT:  Your Honor, the Government believes

5    that it is important that we have an inquiry as to the

6    circumstances surrounding the hiring of Mr. Duarte.  As we put

7    forth in our motion, at the time of her arrest Ms. Suprise did

8    not have Mr. Duarte's card in her purse, though she had the

9    card from several local attorneys.

10         Regarding putting in appearance and he had been

11   making the inquiry of the Government as to who the Government

12   was going to be arresting after the arrest of Ms. Pena and Ms.

13   Suprise's mother.  And then at the time when she was arrested

14   she was overboard advising her father to call Eddie.  Then we

15   have Mr. Duarte putting in an appearance.

16         We have a situation here where we had an earlier

17   attempt, by Ms. Pena, to hire counsel -- for someone other

18   than Ms. Pena to hire counsel to represent her.  So because of

19   these reasons we believe there has to be an inquiry into how

20   Mr. Duarte happened to be hired on this case and what the

21   source of the funds are.

22         And with respect to the source of the funds, the

23   concern that the Government has, and I think it's pretty much

24   laid out in the Pretrial Services report.  Ms. Suprise and her

25   husband seem to be totally and completely dependent upon her

1    parents.  She lives in a house that they provide, they have a

2    ranch that the parents have provided in trust for the

3    children.  And the source of her income is the business, which

4    the Government alleges is a money-laundering operation.

5           So there should be some independent funds to ensure

6    that Ms. Suprise has independent representation that has only

7    her interest at stake.

8           THE COURT:  Mr. Duarte, any response?

9           MR. DUARTE:  Yes, Your Honor.  It truly is, in my

10   view, and I hate to use the term intrepid (indiscernible) for

11   me, that's what it is.

12          I am a Board Certified attorney in criminal law in

13   the state of Texas, I've practiced over 35 years.  I am

14   licensed by the state of Texas and I am a licensed member of

15   the Southern District of Texas.

16          I have never in my life been sanctioned by the State

17   Bar of Texas or any court, State or Federal, and the

18   suggestion is, number one, I could be acting illegally because

19   I'm taking money from a drug launderer, one.

20          Or two, I'm acting unethically because I'm not

21   interested in representing the interests of Ms. Suprise.

22   Either one of those cases is accurate.

23          The last time we were here I represented to the

24   Court that I was only interested in representing Ms. Surprise.

25   Ms. Surprise advised the Court of that fact.  I advised the

1    Court that I had been contacted and spoke with Victor Soliz,

2    who is also present electronically today.  He asked me why

3    from Ms. Surprise.  I explained that I never take a case,

4    regardless of who pays me, until the client says, yes, I

5    agree.

6           Many cases have a mother, a divorced father and a

7    cousin saying, I will go get you a lawyer and three lawyers

8    show up.  But it's up to the client to decide who the lawyer's

9    going to be.

10          I made it clear at the last hearing that was the

11   case here; that Ms. Surprise was not contacted by me until she

12   authorized me to speak with her.  I did not contact her until

13   she said that this is the lawyer that she wanted.  And that's

14   pretty much it, Judge.

15          The Government has, quote, "a concern," closed

16   quote.  And that is not what Garcia calls for, that's not what

17   the Rules of Ethics call for.  And, you know, I just finished

18   reading a very interesting case about how in a family law case

19   the custodial parents are presumed to be good parents.

20   Lawyers, sometimes refer to the clients that they're presumed

21   to be innocent.  I would hope I presume to be honest and

22   ethical.  There's nothing illegal or unethical in my

23   representation of the client is -- and so is her husband, and

24   can verify that.

25          THE COURT:  Ms. Profit, any response?

1              MS. PROFIT:  Your Honor, I would like to hear from

2    Mr. Soliz.

3              THE COURT:  Well, let's take care of the first

4    matter, I guess to be addressed, is whether or not necessarily

5    we need to go forward with the Garcia hearing before we get to

6    that point.

7              And I guess let me ask Mr. Duarte something just to

8    clarify in regards to his motion at this time.  You basically

9    laid out some of the information laid out here on the Record

10   for this hearing.  But you also noticed about the husband,

11   that he conferred with Defendant Daisy Suprise, confirmed she

12   approved her husband's retaining counsel.

13             So did he retain you or was it another family member

14   who retained you?  I just want a clarification on what you set

15   out in your motion.

16             MR. DUARTE:  I guess he sought to retain me and Ms.

17   Suprise approved my being retained.  And then after she

18   approved that, Mr. Soliz, with a credit card, paid me.  And I

19   don't know how that rises to any level of illegality or any

20   kind of suspect activity.  And I think the Government has to

21   come forward with more than, quote, "a concern," closed quote.

22             And seriously, this is a Sixth Amendment issue.  And

23   for the Government to start making inquires of people about

24   how they choose lawyers or why they choose lawyers, that's

25   over-stepping and that is oppressive behavior, in my humble

1    opinion.

2              THE COURT:  Ms. Profit, let me address you on -- and

3    again, the issue to the Garcia hearing.  Basically,

4    essentially there's a conflict of interest, or the Government

5    can show there's a conflict of interest or a potential for

6    conflict of interest, then there's a need to arise for the

7    Court to inquire.

8              Further, in regards to that conflict or potential

9    conflict of interest, and then if there is, review with the

10   Defendant or the Defendant may be how they wish to proceed.

11             The case law is clear.  Individuals do have a right

12   to choose their counsel and proceed forward who they want to

13   go with, and obviously there are limited circumstances where a

14   conflict of interest may be so great that the attorney needs

15   to be removed.

16             But based on the information I have before me, I

17   guess I don't see any conflict of interest or potential

18   conflict of interest at this time, Ms. Profit.  I understand

19   the Court's concern about what happened, I believe with the

20   co-defendant in this matter.  But it looks like in this

21   instance her husband has retained Mr. Duarte on behalf of her

22   and she does wish to go forward with counsel at this time.

23             So outside of what may have happened with the co-

24   defendant in this matter, I guess is there any information the

25   Government has with any potential conflict of interest that

1     may arise from Mr. Duarte's representation of Ms. Suprise?

2              MS. PROFIT:  The Government does not have any

3     further information to present at this time.  But the

4     Government continues to be concerned that Mr. Duarte is not --

5     that individuals are selecting Mr. Duarte for Ms. Suprise.

6     But at this point in time we do not have anything further to

7     present to the Court.  But should we have something further to

8     present to the Court we will.

9              THE COURT:  So I'll note a couple things.  In that

10    regard in preparing for this hearing I've looked at some of

11    the case law besides what was provided by the Government and

12    Defense counsel.

13             There is nothing that prohibits a third party from

14    retaining an individual to represent that individual through a

15    proceedings is actually in a context of a drug case when that

16    reference was made.  The issues is whether or not that

17    attorney is going to represent that individual to the fullest

18    extent of the law.

19             Based on the information I have here it appears that

20    a family member has retained Mr. Duarte.  I'm not aware of any

21    actual conflict of interest at this time.  I'm not aware even

22    at this stage of anything that would arise to a potential

23    conflict of interest.

24             For that reason, based on the information I have

25    before me I don't think there's any necessity to go any

12

1     further in regards to a Garcia hearing at this stage.

2     Obviously things can change, the circumstances can change as

3     these proceedings go forward.

4          And, Ms. Profit, if additional information does come

5     forward, the Government can file the appropriate motion at

6     this time.  But based on everything I have, and also taking

7     into consideration Mr. Duarte's response here and what his

8     client said at the initial appearance, that she wished to go

9     forward with Mr. Duarte at this time.

10          Based on what I have at this stage there's not

11    enough to go forward with a Garcia hearing.  Therefore, we'll

12    take up the next matter, which is the preliminary hearing.

13    Mr. Duarte, announcement in that regard?

14          MR. DUARTE:  We're ready, Judge.

15          THE COURT:  Ms. Profit, I believe your witness may

16    be online, Agent Yates.  Is that correct?

17          MS. PROFIT:  Yes, Your Honor.  The Government's

18    witness is online.

19          THE COURT:  Agent Yates, first of all I do see you

20    here and hopefully you've been able to hear everything so far.

21          MS. YATES:  Yes, Your Honor.

22          THE COURT:  Okay.  Before we go any further let me

23    take care of a couple preliminary matters.

24          If you could please raise your right hand and the

25    Clerk will formally place you under oath.

1        (Witness sworn.)

2              THE COURT:  You may place you hand down.  And just

3    so it's clear for the Record, can you state your full name for

4    the Record?

5              THE WITNESS:  Yes.  It is Mariah Yates.

6              THE COURT:  And who do you work for at this time?

7              THE WITNESS:  I work for the Drug Enforcement

8    Administration.

9              THE COURT:  Before we go forward, so far, Mr.

10   Duarte, have you been able to hear everything?

11             MR. DUARTE:  Yes, sir.

12             THE COURT:  And Ms. Suprise, have you been able to

13   hear everything as well?

14             THE DEFENDANT:  Yes, Your Honor.

15             THE COURT:  Okay.  A couple of things if I could

16   advise -- I don't know if it's Deputy Marshal or a guard over

17   at the facility.  But if they could provide you a chair for

18   this portion of the hearing, and this is addressed to Ms.

19   Suprise, she can sit down for this portion of the hearing.

20             The other thing I would like to address with Mr.

21   Duarte.  Obviously we've had some connection issues.

22   Hopefully we'll be able to go through this hearing without any

23   other connection issue.  Obviously if there is I'll work with

24   the IT staff here in McAllen and hopefully get everybody back

25   online in that regard.  But if there's any connection issues,

1    please do let me know.

2          Finally, Ms. Suprise, let me address you.  I do

3    advise individuals at the facility, normal circumstances you

4    would be sitting next to your attorney.  You'd be able to talk

5    to your attorney here in the courtroom.

6          As this hearing goes forward, if you believe there's

7    a need for you to speak with your attorney, please just raise

8    your hand or get my attention.  I'll be able to place you in a

9    breakout room, give you an opportunity to consult with him,

10   and then he'll be able to advocate for you on your behalf.

11         Again, we're using the video conference system.  I

12   have conducted several of these hearings and these are usually

13   addressing issues that usually develop through the course of

14   the hearing.  So hopefully we won't have any here this

15   afternoon.

16         Ms. Profit, you may proceed.

17         DIRECT EXAMINATION OF SPECIAL AGENT MARIAH YATES

18   BY MS. PROFIT:

19   Q    Could you state your name for the Record, please?

20   A    Yes.  I'm Agent Mariah Yates with the DEA.

21   Q    Have you been involved in the investigation of South

22   Texas Beauty Supply?

23   A    Yes, I have.

24   Q    And during the course of this investigation did some

25   undercover offices go to South Texas Beauty Supply?

1    A    Yes, ma'am.

2    Q    Can you describe the circumstances of the use of the

3    undercovers --

4    A    Yes, ma'am.

5    Q    -- and the dates upon which they did this?

6    A    Yes, ma'am.  The first operation began -- the money was

7    delivered on February 14th of 2018.  And the second undercover

8    operation was on August 2nd of 2018.

9    Q    And in terms of that operation, what did we know in terms

10   of the source of the funds?

11   A    That they were drug proceeds from drugs that had been

12   delivered to those areas on prior occasions.

13   Q    And what were the undercovers told in terms of where the

14   drug proceeds had to go?

15   A    They were told to be delivered to McAllen, Texas.  Upon

16   traveling to McAllen, Texas they were given a phone number and

17   that phone number was for South Texas Beauty Supply in

18   McAllen, Texas.

19   Q    And was there any point in time where they were told to

20   meet with Daisy?

21   A    Yes, ma'am.  On the first occurrence in February of 2018,

22   Ms. Suprise's name was mentioned as being a person that could

23   take in the currency.

24   Q    And did the undercover agents -- who did the undercover

25   agents meet with?

1  A    On that day they ended up meeting with Ms. Pena, Yolanda

2  Pena.

3  Q    And was this videotaped?

4  A    Yes, ma'am.

5  Q    And do we have a video tape of that?

6  A    Yes, ma'am.

7  Q    And how much money was delivered at that time?

8  A    Approximately $83,000.

9  Q    And on the video tape was there any discussion as to the

10  source of the money?

11  A    There was comments that it was dirty money and that her

12  hands needed to be cleaned because of the dirty money.

13          MS. PROFIT:  Excuse me, Your Honor, but Mr. -- okay,

14  Mr. Duarte's back.  Okay.

15          MR. DUARTE:  I never left, Judge.  I just had to

16  pick something up off the floor.

17          THE COURT:  Thank you for the clarification.  And,

18  Ms. Profit, you may proceed.

19          MS. PROFIT:  Pardon me?  I'm sorry, Your Honor.

20          THE COURT:  You may proceed, Ms. Profit.

21  BY MS. PROFIT:

22  Q    So the 83,000.  What were the nature of the discussions

23  that the undercover had?

24  A    Did say it was dirty money and that she needed to clean

25  her hands because it was dirty.

1    Q    Tell us and describe the second incident.

2    A    The second incident was in August, on August 2nd of 2018.

3    On that occurrence the money was delivered to Maria Estella

4    Suprise and Yolanda Pena, and that was approximately $55,000.

5    Q    Now when this money was delivered, were there any

6    discussions about the source of this money?

7    A    Yes.  That it was dirty money but that she actually gave

8    Ms. Suprise, Estella, Maria Estella, gave information that she

9    preferred money orders and gave information on how to obtain

10   money orders in certain amounts so that you do not have to

11   provide identification.

12   Q    And during the course of your investigation did you do

13   any research with respect to any money launderings going to

14   South Texas Beauty Supply?

15   A    Yes, ma'am, we did.

16   Q    And what did you find?

17   A    We found that they were getting multiple shipments of

18   money orders via FedEx and that we were actually able to do

19   sneak and peek warrant as well as seizure warrants for the

20   money orders.

21   Q    And how much did you seize?

22   A    We seized approximately $15,000 in money orders and

23   during the sneak and peeks we observed approximately $40,000

24   in money orders.

25   Q    And what was the source of the funds?

1    A    We believe they were involved in drug trafficking up in

2    the Detroit and Toledo, Ohio -- other areas in Ohio.

3    Q    And have you done any research in terms of how many money

4    launderings are coming through the banking account, bank

5    account.  Did you do any statistical analysis of that?

6    A    Yes, we have.

7    Q    And if you can recall, what did that show you?

8    A    Large amounts, upwards of $600,000 in money orders within

9    our investigation.

10   Q    Now, have you done any research with respect to cash into

11   the South Texas Beauty Supply?

12   A    Yes, ma'am.

13   Q    And do you know what amounts of cash have been going into

14   South Tex Beauty Supply?

15   A    Approximately $9 million in cash for a year for the past

16   few years.

17   Q    Now, when it comes to Ms. Daisy Suprise, what is her role

18   in the organization, if you will?

19   A    I believe she is a manager of the business.  But we

20   believe that money was being kept in her office and she was

21   assisting her mother in transporting the money.

22   Q    And when you "say she was assisting her mother in

23   transporting the money," what did you mean?

24   A    Post the search warrant at the business we have the

25   phones belonging to Maria Estela Suprise and Joanna Pena.

1    Agents got consent to search those phones and during consent
2    searches located messages between Maria Estela and Yolanda
3    Pena as well as with Daisy, stating that there was money being
4    kept in her office and whether she should bring it to her
5    mother's house or if it should remain there.  And it was large
6    amounts of currency.
7    Q    And when you say "large amounts of currency," what do you
8    mean by large amounts of currency?
9    A    Approximately $100,000 in cash.
10   Q    And the direction was for Daisy to bring the money to her
11   mother's?
12   A    Yes, ma'am.
13   Q    Now, did we execute a search warrant at Estate Suprise's
14   home?
15   A    Yes, ma'am, we did.
16   Q    And what did we find in terms of money there?
17   A    We found approximately $16,000 located in a safe in the
18   residence.
19   Q    And with that money, was there anything else that you
20   recovered?
21   A    Yes, ma'am.  There was an envelope portraying a letter of
22   currency with the name of another co-conspirator that was a
23   customer.
24   Q    And when you say this other co-conspirator, is this the
25   individual that you believe was transporting large sums of

1    money to South Texas Beauty Supply?

2    A    Yes.  They money was on behalf of this individual.

3    Q    Now, at the time of Estela Suprise's arrest, what kind of

4    money did she have on her person or in her purse?

5    A    She had approximately $11,000 in her purse.

6    Q    And did she tell you what the source of that money was?

7    A    Yes.  She said that approximately $10,000 of the money in

8    her purse belonged to that co-conspirator also.

9    Q    Now, in terms of Daisy Suprise.  At the time of her

10   mother's arrest did she have any money in her purse?

11   A    Yes, ma'am.  She had approximately $6,000 in U.S.

12   currency.

13   Q    But she didn't -- she said that it was a bonus from the

14   business, correct?

15   A    That is correct.

16   Q    Did she indicate it was because of the good work she was

17   doing for the business?

18   A    She did not indicate the reason for the bonus, just that

19   it was a bonus from the business.

20   Q    In reviewing Ms. Suprise's tax returns, have you

21   discovered that she's received substantial increase in salary?

22            THE COURT:  Ms. Profit, just before -- this needs to

23   be clarified obviously of the mom and the daughter in regards

24   to tax returns, who are you referencing, Ms. Profit?

25            MS. PROFIT:  I'm asking with respect to Ms. Daisy

1   Suprise's tax returns.

2           THE COURT:  Ms. Yates, you may proceed.

3           THE WITNESS:  Yes, Your Honor.  We did notice a very

4   large increase in the past few years.  I'd reference 2018, it

5   increased to $99,000 whereas in previous years it had been

6   approximately 16 to $30,000.

7           MS. PROFIT:  I have no further questions of this

8   witness, Your Honor.

9           THE COURT:  Mr. Duarte.

10          MR. DUARTE:  Thank you, Your Honor.

11       CROSS-EXAMINATION OF SPECIAL AGENT MARIAH YATES

12   BY MR. DUARTE:

13   Q    Agent Yates, I would like to start by asking you if you

14   can please tell the Court what the difference is between South

15   Tex Beauty Supply, Inc. and South Tex Beauty and Barber

16   Supply, Inc.

17   A    I am not aware of any large difference, just that Inc.

18   encompasses both, I believe.  But I am not aware of any

19   difference in the two.

20   Q    You were just asked about doing some statistical analysis

21   and I'm curious, what did you analyze in terms of company?

22   A    It was the all-encompassing company of South Tex Beauty.

23   Q    Okay.  When you say there's an "all encompassing

24   company," are you telling Judge Alanis that both use the same

25   taxpayer identification number?

1    A    I am unaware.  I am unsure.  We are looking at Ms.
2    Suprise's personal tax returns, not for the business
3    specifically.
4    Q    No, ma'am.  I'm sorry.  I heard you say that you did a
5    statistical analysis of South Tex Beauty Supply.
6    A    Yes.
7    Q    Did I hear that right?
8    A    In regards to the amount of currency coming in, yes, sir.
9    I am talking about the tax returns.
10   Q    Well, no.  I asked about a taxpayer identification number
11   for each company.  Do you know those?
12   A    I don't know them personally for each business.  But we
13   are looking at the business in total, not separately.
14   Q    Okay.  And when you look at the bank accounts for South
15   Tex Beauty Supply, Inc. and South Tex Beauty and Barber
16   Supply, Inc., do they have separate bank accounts?
17   A    There are multiple bank accounts.  But during our
18   analysis we did see that funds were being transferred between
19   accounts continuously.  So there was a lot of movement of
20   funds from one account to another.
21   Q    And when we are talking about accounts, did that include
22   STV Creations, Inc.?
23   A    I believe so.
24   Q    Did that include ST Ranches, Inc?
25   A    I believe so.

1    Q    Did that include ER-1980, LLC?

2    A    I believe so.

3    Q    Now, when it came to these companies and your review of

4    their documents, did you review the IRS audits for these

5    different companies?

6    A    We have not yet.  We are working on trying to do that,

7    but we have not been able to do that yet.

8    Q    All right.  And if I were to represent to you that these

9    companies were audited by the IRS and they did not have any

10   penalties assessed, would that surprise you?

11              MS. PROFIT:  Your Honor, relevancy.

12              MR. DUARTE:  Well Judge, she has said that there is

13   money coming in and it's all drug money.  The IRS going in and

14   looking at what money comes in for purchase of legitimate

15   assets and the sales, those are computations the IRS did.  And

16   this agent has put every single company together and lumped it

17   all together.

18              MS. PROFIT:  Your Honor, it's still an issue of

19   relevancy.  She's indicated that she has not gotten

20   information about the IRS audit.  So it's totally unfair to

21   ask her questions about it or to have her draw conclusions

22   about it.  We don't even know the nature and extent of the

23   audit other than what Mr. Duarte is representing.

24              THE COURT:  Mr. Duarte, any further argument before

25   I rule?

1          MR. DUARTE:  Yes, Judge.  The argument is that they

2     have come into court and made a representation that this is,

3     and I'll quote Ms. Profit, "a drug money laundering

4     operation," closed quotes.  And in fact this is a business

5     that the IRS has audited that says they buy and sell beauty --

6     one is beauty supplies and one is beauty and barber supplies.

7     They spend hundreds of thousands of dollars buying these

8     things.  They get hundreds of thousands of dollars back for

9     selling these things.  And I'm not going to get into a

10    distinction there.  But, you know, they're making a

11    representation that this question is relevant to.

12         THE COURT:  So in regards to this, what is my

13    understanding is she is not aware of the IRS audit or the

14    results of the IRS audit.  So I think this is beyond the scope

15    of what she is aware of and, you know, may be a little bit

16    beyond the scope of the preliminary hearing.

17         I do understand, Mr. Duarte, your argument in

18    regards to how evidence presented and the argument presented

19    from the Government about this being money laundering funds.

20    But the agent has testified she is not aware of that audit or

21    the results of that audit.

22         Mr. Duarte, if you want to present a witness or

23    present any evidence in regard to that at the appropriate time

24    you can, but I want to sustain it as she's already answered,

25    she's not aware of the audit or the facts and circumstances of

1    that audit, if it did exist.

2                MR. DUARTE:  Yes, sir.

3    BY MR. DUARTE:

4    Q    You have talked about two different events, February 14,

5    2018 is the first one.  Is it fair to say that the February

6    14, 2018 event was supposed to occur on February the 13th,

7    2018?

8    A    Yes.  It would have occurred on February 13th of 2018.

9    But due to time restraints the undercover was not able to make

10   it to McAllen in time to arrive before the business closed

11   that day, so it happened on February 14th.

12   Q    Before February 14th the undercover officer never met

13   with Daisy Suprise, is that true?

14   A    That is true.  It was all via phone calls.

15   Q    Well, when you say that is it true that there are no

16   phone calls between Daisy Suprise and the undercover officer?

17   A    We don't believe so.  The person on the phone line, an

18   unknown female, stated that Daisy was able to accept the

19   currency.

20   Q    So Daisy never spoke with an undercover agent?

21               MS. PROFIT:  That was not her testimony, Your Honor.

22               MR. DUARTE:  I'll rephrase it, Judge.

23               THE COURT:  So I just understand Agent Yates

24   testimony.  I believe in that call in particular, and it's set

25   out in the criminal complaint that she was referencing, was

1    that someone had answered the phone and said something to the

2    extent that Daisy will be able to meet you or received you.

3            Is that correct, Agent Yates?

4            THE WITNESS:  Yes, Your Honor.  That is correct.

5            THE COURT:  Mr. Duarte, you may proceed.

6            MR. DUARTE:  Thank you, sir.

7    BY MR. DUARTE:

8    Q    So with regard to that specific event, is it fair to say

9    that Daisy Suprise never participated in the transfer of

10   drugs, to your knowledge?

11   A    To my knowledge I cannot state whether she did or she did

12   not.

13   Q    All right.  You don't have a witness that's going to say

14   that she participated in the transfer of the drugs that led to

15   a return of cash; fair?

16   A    As of right now, yes, that's correct.

17   Q    And as of right now you don't have Daisy Suprise ever

18   touching any of the proceeds that you say came from a drug

19   sale; true?

20   A    I cannot say that.  Based off the messages that I saw, it

21   seemed that she did have her hands on drug proceeds that were

22   in the business.

23   Q    I'm talking about the February 14th, 2018 event, ma'am.

24   Did you have any tie of this witness by way -- of this

25   Defendant by way of any witness seeing her, possessing the

1    drug money or directing its traffic?

2    A    No, sir.

3    Q    Okay.  Now then after the 13th, the transfer occurs on

4    the 14th and there's no witness that places her at the scene

5    of the delivery of any proceeds; fair?

6    A    That is fair.

7    Q    And you have no recorded phone conversations where Daisy

8    Suprise says anything about monies that she is saying

9    constitute drug proceeds.  Is that fair?

10   A    That is fair.

11   Q    And you have no undercover agent or independent witness

12   that puts her in possession of monies that she characterized

13   as drug proceeds.  Is that fair?

14   A    On that date, no, sir.

15   Q    Ever?

16   A    I cannot say that as never.

17   Q    Do you have a witness?

18   A    I have messages stating that she had the drug proceeds.

19   Q    My question is, do you have a witness that says she

20   concedes or states or affirms that money in her possession

21   came from illegal activities?

22            MS. PROFIT:  Asked and answered, Your Honor.

23            MR. DUARTE:  I've asked for --

24            MS. PROFIT:  He's badgering the witness.  He's

25   badgering the witness.

1        THE COURT:  Mr. Duarte, I'm going to sustain that

2    objection.  You may continue on with your questioning.

3        MR. DUARTE:  Yes, sir.

4    BY MR. DUARTE:

5    Q    Is it fair to say there are no recordings of Daisy

6    Suprise confirming any monetary transaction as being illegal?

7    A    As of right now, no, sir.

8    Q    Okay.  Now, you made reference to $100,000 that somebody

9    placed in Daisy Suprise's desk.  Do you recall that?

10   A    Yes, sir, I do.

11   Q    And it is my understanding, having read some documents --

12   and I just want to be sure that we're clear on this -- that

13   $100,000 was placed in Daisy Suprise's desk.  It was not

14   placed there by her; true?

15   A    I believe that is true.  Yes, sir.

16   Q    And is it also true -- and this is where I got a little

17   confused.  Is it also true that she never moved that money

18   herself?

19   A    I cannot state that that is true, due to the fact that I

20   have messages stating that she would be bringing it to Maria

21   Estela's residence.

22   Q    Well, and this is why I'm asking.  Is that the messages

23   that I'm privy to had to do with could she take the money to

24   her mom's house.  Are you saying there are messages saying,

25   take it to your mom?

1    A    I have messages saying that she is going to take the

2    money to the mother's house.

3    Q    And do you have confirmation that ever occurred?

4    A    I do not have confirmation of that.  No, sir.

5    Q    Do you know the source of that specific $100,000?

6    A    Yes, sir, I do.

7    Q    And it was for a specific transaction?

8    A    It was for a specific customer.  I am unsure of a

9    transaction, but it's for one individual.

10    Q    Okay.  And I don't think it's a secret and I'm not going

11    to say his name.  But that specific customer, are you

12    suggesting every single -- anything he spends comes from

13    illegal proceeds?

14    A    We believe the majority of his money is involving

15    narcotics, and that is what he does, he is laundering money

16    for the drug cartels.

17    Q    Okay.  And you don't have any information that Ms.

18    Suprise is a member of any drug cartel; is that fair?

19    A    That is fair.

20    Q    Do you know the difference or can you tell us if there is

21    a difference between the business that operates on the second

22    floor of the building and the first floor of the building?

23    A    I do not know the interworkings of the business.  Just

24    from post-arrest interviews we are being told that the below

25    half is the retail, the upstairs just deals with the Mexican

1  clients.

2  Q    All right.  And my client works downstairs in retail; is

3  that fair?

4  A    When we did the warrant she did have an office downstairs

5  and she did state that she was working the downstairs area,

6  the retail portion.

7  Q    Do you know which corporation operates the international

8  part and which corporation operates the retail part?

9  A    I do not, no, sir.

10  Q    Have you traced specific cash from the wholesale business

11  that was delivered as drug proceeds that were transferred

12  downstairs to the retail business?

13  A    In a way we were unable to do that due to the amounts

14  being broken into smaller increments and deposited on multiple

15  days rather than being deposited all at once.

16  Q    You indicated that you seized $15,000 in currency.  Do

17  you recall that testimony?

18  A    It wasn't U.S. currency, it was money orders, so a

19  financial instrument.

20  Q    All right.  And do you seize those from whom?

21  A    They were en route to the business at South Tex Beauty

22  via FedEx envelope.  They were seized en route.

23  Q    And it was addressed to whom?

24  A    I believe it was Maria Estela Suprise.

25  Q    You do not have confirmation that Daisy Suprise had any

1   connections with any illegal activities in the Detroit area,

2   do you?

3   A   I cannot confirm nor deny that at this moment.  No, sir.

4   Q   Well, for purposes of this hearing and her involvement,

5   you don't have a witness that is willing to say she directed a

6   drug deal in Detroit?

7   A   No, sir.  Not currently, no.

8   Q   All right.  And you indicated that this person that is

9   involved with the cartels that may be laundering money has

10  other illegal business dealings in the Ohio area generally.

11  Do you have any recordings between Daisy Suprise and that

12  individual?

13  A   No, sir, I do not.

14  Q   Do you have any phone calls between her and a number

15  attributed to this individual that supposedly launders money?

16  A   As of right now, no, sir.

17  Q   Okay.  In the statistical analysis that you did for the

18  wholesale operation -- well, maybe I don't understand.

19      The statistical analysis that you did that involved

20  approximately $9 million in cash, that's over what period,

21  please?

22  A   That would be over one-year period, sir.  We did it over

23  -- it was an average of approximately $9 million per year for

24  the past ten or so years.

25  Q   All right.  And in that approximation, how many

1    corporations are involved in that total money sum?

2    A    If I can guess I want to say it was -- for all businesses

3    utilizing the beauty supply address as their address.

4    Q    And so the ranching operation, for example, I think out

5    in Starr County, it receives mail on the Broadway address in

6    McAllen?

7    A    I believe so.  I cannot -- I am unsure if all their mail

8    goes there or if it goes to another area.

9    Q    In that 9 million that you're talking about, will that

10   include the buying and selling of cattle?

11   A    I do not believe so, sir.

12   Q    Would it involve oil royalties?

13   A    I am unaware of any oil royalties.

14   Q    Now, over this ten-year period you indicted that Daisy

15   Suprise's income changed a small amount up to almost $100,000;

16   fair?

17   A    That is fair, yes, sir.

18   Q    And can you explain to the Court how the time she spent

19   at that business changed over those years?

20   A    I cannot.  As of right now I have not fully looked at

21   them.  I only looked at them for the amounts to show what she

22   was filing for taxes.  I've not looked at her hourly workings.

23   No, sir.

24   Q    Okay.  Do you know when she was in college, for example,

25   and unable to work?

1    A    No, sir.

2    Q    You know she has two children, correct?

3    A    That is correct.  Yes, sir.

4    Q    Do you know how much time she took off from work so that

5    she could raise her children at younger ages?

6    A    No, sir, I do not.

7    Q    Do you know when she returned as a full-time manager?

8    A    No, sir, I do not.

9    Q    You indicated there was $6,000 in cash on Daisy Suprise's

10   person in her purse that she said was a bonus, correct?

11   A    That is correct.

12   Q    You indicted she did not give you a reason for that.  Did

13   someone ask her for a reason?

14   A    I was not there at the time.  I do not know if agents

15   asked her what the reasoning for the bonus was, just that she

16   stated it was a bonus from the business.

17   Q    Now, Mr. Suprise, Daisy's dad, he has not been indicted;

18   fair?

19   A    As of right now, no, sir, he has not been indicted.

20   Q    And he's still operating those businesses, is he not?

21   A    I believe so.  I'm not sure, but I believe so.

22   Q    All right.  If there is --

23              MS. PROFIT:  Objection, relevancy.

24              THE COURT:  Mr. Duarte, that's a good point from Ms.

25   Profit.  What is the relevancy in regards to this line of

1   questioning involving her father, Mr. Suprise?

2          MR. DUARTE:  It goes to the strength of the

3   Government's case associated with this, quote, "money

4   laundering operation."  He was approved by the Court, I think,

5   as a third-party custodian for Maria Estela Suprise.  He's not

6   indicted.  Nobody said anything bad about him.  If she is in

7   that same vein it goes to the strength of the Government's

8   case under the Bail Reform Act.

9          THE COURT:  I think all that could be made under

10  argument.  If you could move on with your questioning.

11         MR. DUARTE:  Yes, sir.

12  BY MR. DUARTE:

13  Q   The $100,000 that was placed in Daisy Suprise's desk.

14  I'm just looking at my notes and what was said here.

15         Do you have evidence that she actually ever took

16  possession of that 100,000?

17         MS. PROFIT:  Your Honor, that's been asked and

18  answered.  Asked and answered.  And the agent has already

19  testified to that.

20         THE COURT:  Mr. Duarte, that question has been asked

21  and answered.

22         MR. DUARTE:  Okay.  I believe that's all my

23  questions, Your Honor.

24         THE COURT:  Ms. Profit, any follow up at this time?

25         MS. PROFIT:  No, Your Honor.

1          THE COURT:  Agent Yates, for purposes of the

2     preliminary and detention hearing, we're obviously doing

3     everything here through the video conferencing.  For lack of a

4     better phrase you can formally step down from the stand at

5     this time, but do stay online should any further testimony be

6     needed as the proceedings go forward.

7          (Witness excused.)

8          THE COURT:  Ms. Profit, any further witnesses at

9     this time in regard to the preliminary hearing?

10          MS. PROFIT:  No, Your Honor.

11          THE COURT:  Mr. Duarte, do you have any witnesses --

12     actually you mentioned tax returns.  I don't know if you're

13     going to bring up any evidence in regard to the tax returns.

14          MR. DUARTE:  No, Your Honor.  I'm not going to put

15     on any evidence at this point.

16          THE COURT:  So for purposes of the preliminary

17     hearing, Ms. Profit, any argument?

18          MS. PROFIT:  Your Honor, the Government believes

19     that there is probable cause to believe that this individual

20     has been engaged in a money laundering operation, which the

21     intent was to disguise the nature, location of the monies.

22          There is testimony that there was monies that was

23     being delivered by undercover officers; that her co-

24     conspirators indicated that Daisy was one of the individuals

25     that it could be delivered to.  She did not happen to be there

1    on that day that the money was counted, and at the time there

2    were comments that were being made that were video taped with

3    respect to the fact that they had to clean money.

4         At the second opportunity there was a suggestion

5    that money orders would be used.  The agents have reviewed Ms.

6    Suprise's -- have reviewed text messages between Yolanda Pena

7    and Ms. -- her mother, Ms. Suprise, where the money was being

8    directed; that the money -- cash that was being -- come in was

9    being directed for Daisy to bring it to her mother.  There was

10   corroboration of the fact in the text messages that this had

11   occurred.  There was large sums of money that was being

12   delivered.

13        And throughout the whole source of the operations we

14   find that there is extreme large amounts of money that are

15   going through the organization.  The agent testified to $9

16   million going through accounts.

17        When you look at the Pretrial Services report, you

18   see that Ms. Suprise is also engaged in an extremely large

19   lifestyle.  It is consistent with her being a participant in

20   the money laundering organization.  We believe that there is

21   sufficient -- that there are sufficient facts articulated

22   through the testimony of the agent and in the criminal

23   complaint to find probable cause that the purpose of this was

24   to disguise the nature and so was et cetera of the monies that

25   were coming in from that particular individual in Mexico.  So

1    we ask that the Court find probable cause.

2              THE COURT:  Mr. Duarte.

3              MR. DUARTE:  Yes, Your Honor.  I would respectfully

4    disagree with Ms. Profit.  I do not believe there is probable

5    cause in this specific case for many many reasons.

6              The Government has accused, by way of its criminal

7    complaint, that my client participated in the transfer of

8    money, concealing of money that she knew to be from an illegal

9    source.  And there is nothing here that suggests that.

10             We have an individual the Government believe is

11   involved in illegal activity.  He may be, he may not.  I don't

12   know that yet.  But that person never met with Daisy Suprise

13   and never spoke with Daisy Suprise, never got directions from

14   her, never gave directions to her.  That individual allegedly

15   takes monies and delivers them to who knows where.  I'm going

16   to, for the sake of argument, suggest that it is to the

17   wholesale operation, not the retail operation.

18             But, regardless, the person comes with money and

19   delivers it and the money is counted and gets a receipt.

20   That's no different than any other bank transaction.  There

21   has to be something that ties Daisy Suprise to an illegal act.

22             The only thing that happened with Daisy Suprise that

23   we know about is, on February 13, 2018 a person said Daisy

24   Suprise will be here and she can accept the money for you.

25   Okay.  That's like saying a bank teller can take your deposit,

1        or back in the day when my wife worked there, those are the

2        special tellers that you take to the vault.  It doesn't mean

3        that the money is illegal.

4                Then there is another event where $100,000 is placed

5        in Daisy Suprise's desk, and the Government says there is some

6        kind of email, text, or message about should the money be

7        taken to Maria Estela Suprise, the mom.  Well, whether she

8        should take it there, leave it in the desk, deposit it in the

9        bank, is just an option.  It doesn't mean that the money is

10       known by my client to be illegal.  Even if it were, and I'm

11       not suggesting that it is, I'm not conceding that fact.

12               But this business that has $9 million in sales, the

13       Government hasn't even told you how much of that money comes

14       from illegal proceeds.  I've got no clue sitting here today.

15       And just by way of example, if $500,000 was used to buy Wahl

16       scissors and Wahl, W-a-h-l, clippers and all kinds of items

17       that are common in the beauty and barber industry.  If $500,00

18       went there and 8,500,000 was in legitimate sources, for

19       whatever percentage you may want to say, how does that tie

20       Daisy Suprise to anything.

21               There are multiple corporations that we have named

22       today, and they each have a function.  One might hold real

23       estate, one might sell cows, one might sell items retail and

24       some might sell wholesale and some may have others --

25               MS. PROFIT:  Your Honor, is Mr. Duarte making an

1    argument or is he testifying?

2              MR. DUARTE:  Based on --

3              THE COURT:  Ms. Profit --

4              MR. DUARTE:  -- it's argument.

5              THE COURT:  -- he's laying out the argument why he

6    believes there is insufficient probable cause.

7              He may continue on with his argument at this time.

8              MR. DUARTE:  So the government has failed to

9    establish any connection between anything illegal.  They

10   haven't quantified it, even though they did a statistical

11   analysis of it.  And $600,000, op end of $9 million, isn't

12   even 10 percent.  So how is my client tied to any illegal

13   activity in terms of evidence?  There really is none that she

14   knew that any money that her mother received for any client

15   was illegal.

16             And so that's where there is a lack of probable

17   cause.  Now, if somebody had said, Ms. Suprise, do you want to

18   take this illegal money that I got for some of these drugs,

19   and she said, yes, that would be one thing.  If the

20   confidential informant said that, if an undercover officer

21   said that, if a co-defendant said she knew the money was

22   dirty.

23             Talk to people what they did on video tape.  That

24   may be a whole different matter.  And we're talking about

25   Yolanda and Maria Estela, is my understanding.  I haven't seen

1    the video tape.

2            But there's no such thing with Daisy, the daughter.

3    And so she had a legitimate business operation on the first

4    floor and I'm assuming the Government has shut down Mr. Big,

5    or whoever this launderer is, and she can continue selling

6    scissors and the like.  But in terms of probable cause, we

7    disagree that any exists.

8            THE COURT:  Ms. Suprise, I want to address you at

9    this time.  If you could please stand up.

10           THE DEFENDANT:  Yes, Your Honor.

11           THE COURT:  We are set here for a preliminary

12   hearing to determine at this stage whether or not there's

13   sufficient probable cause to allow the Government to go

14   forward with these proceedings.  You do not need to say

15   anything at this time, by the way.  I just remind you of that.

16   Every now and then individuals feel a need to speak up.

17   Again, your counsel is online and if you believe you have a

18   need to talk to him, just raise your hand and I'll give you

19   that chance to speak with him.

20           In regard to the probable cause portion, the

21   preliminary hearing the standard is, is there sufficient

22   evidence to allow the Government to go forward.  In making

23   this decision I want to take into consideration the criminal

24   complaint as well as the testimony of Agent Yates from DEA

25   this afternoon.  I will also take into consideration the

1    arguments on behalf of the argument from Ms. Profit, and the

2    arguments on your behalf from Mr. Duarte.

3         You are charged in a criminal complaint from

4    February 14th of 2018 to February 15th of 2019 of being

5    connected to a conspiracy to essentially launder drug proceeds

6    in violation of Title 18, United States Code 1956(h).

7         The evidence presented in regards to your

8    involvement and in connection with the conspiracy is it

9    appeared that in regards to one transaction of drug proceeds

10   being delivered to the business back in February 2018, an

11   individual stated that you would be able to receive those drug

12   proceeds.

13        I will note, as it has been set forth by your

14   counsel, you are not the individual that actually received

15   those drug proceeds.  It appeared to be Ms. Yolanda Pena at

16   the time based on the criminal complaint.  But there was

17   evidence there of your involvement in that you had received

18   those drug proceeds.  There is another transaction set forth

19   in the criminal complaint from August 2nd of 2018 involving

20   about $55,000 of currency connected to drugs proceeds and drug

21   transaction.  In particular, a methamphetamine transaction

22   from July of 2018.

23        I forgot to note the amount of money delivered back

24   in February was approximately $83,420.

25        In connection with this second transaction, as

1    noted, I believe by your counsel and testimony presented, you

2    were not involved with that transaction but there was a

3    delivery of that amount of proceeds.  The individuals involved

4    was a Maria Estela Suprise and Yolanda Pena, based on the

5    criminal complaint in regard to that transaction of August 2nd

6    of 2018.

7              At the time of arrest $11,000 was collected from a

8    co-defendant, Maria Suprise, that I believe to be connected to

9    the money laundering activities of an un-indicted co-

10   conspirator in this transaction.  $6,000 were collected from

11   you.  The Government has alluded that they believe that's

12   probably connected to money laundering transactions.  But

13   other than their illusions they have presented no further

14   evidence in that regard to this $6,000.

15             Also based on testimony of Agent Yates there was

16   various text messages that were found, in particular from

17   October 12th of 2018, between a Ms. Yolanda Pena, who was

18   involved with those transaction, and Ms. Daisy Suprise, about

19   having about 100 -- believed to be $100,000.

20             Basically, as set forth in the complaint, Daisy, you

21   have some money in your office, it's 100.  So you can secure

22   them, please.  The response, allegedly from you at that time

23   is, where, I'm already here.  Ms. Yolanda Pena, in the drawer

24   on the right.

25             But another transaction -- or transcript -- I'm

1    sorry, on October 12th, 2018 of a conversation of the text

2    messages between Ms. Yolanda Pena and Maria Suprise advising

3    that there was 100 from the un-indicted co-conspirator.  Ms.

4    Maria Suprise asked where the money's at.  Set forth that the

5    money is in Daisy's office and she's going to take it to your

6    house and location, meaning it would be taken to Ms. Maria

7    Suprise's residence.

8           And then there's a text message, February 15th,

9    2019.  Again, between Yolanda Pena and Ms. Maria Suprise

10    that's been translated here.  Ms. Pena advises they brought

11    money orders, 150; do I leave them here or does Daisy take

12    them to your house, waiting instruction.  So Ms. Maria Suprise

13    advised, keep them there.  I'll return in the afternoon.

14           I do understand the argument from your counsel that

15    there is not a direct witness saying this individual, being

16    you, Ms. Suprise, Daisy Suprise, was involved in the drug

17    transaction, or maybe an individual saying you were involved

18    with the laundering of the proceeds.

19           But looking at the totality of the circumstances,

20    looking at the transaction involved from February of 2018 and

21    August of 2018, and looking at the text messages outlined in

22    the complaint and testified here this afternoon, there is

23    sufficient evidence on a probable cause standard to allow the

24    Government to go forward with these proceedings.

25           Essentially probable cause has been a sign as

1       evidence sufficient to cause a person of ordinary prudence and

2       caution to consciously entertain a reasonable leap that the

3       accused committed the crime.  That's stated in *Illinois v.*

4       *Gates*.  Probable cause deals with probabilities.  These are

5       not technical.  They are the factual and practical

6       consideration of every day life on which reasonable and

7       prudent men, not legal technicians act.

8              Taken into consideration we are set here only for a

9       probable cause hearing.  For the evidence outlined I do

10      believe there is sufficient evidence to show that you are

11      involved in the conspiracy to launder drug proceeds.

12             I will note, Ms. Daisy Suprise, this is not the

13      ultimate finding of guilt or innocence based on proof beyond a

14      reasonable doubt.  There may be other facts or circumstances

15      that may affect the final outcome of the case, and that is

16      something for your attorney, Mr. Duarte, to review with you as

17      these proceedings go forward.

18             Again, I will note I did take into consideration his

19      arguments, did understand his arguments without being no

20      direct evidence.  But again, looking at the totality of the

21      circumstances, taking into consideration those text message on

22      a probable cause standard at this time there is sufficient

23      evidence to allow the Government to proceed forward with these

24      allegations.

25             With this finding here we are now proceeding forward

1      with the detention hearing.  Government recommendation?

2           MS. PROFIT:  Your Honor, the Government is very much

3      concerned about in reviewing the Pretrial Services report,

4      frankly the situation is worse than the Government thought.

5      We see an awful lot of overlapping in terms of expenses

6      between Ms. Suprise and her parents, which would not normally

7      be of concern other than the fact that the mother and the

8      business are so heavily involved in this trade-based money

9      laundering.

10          And so the concern we have, for purposes of letting

11     this woman out on bond is, where is she going to live, because

12     her present residence is right behind her mother.  How is she

13     going to support herself, because she can't continue to live

14     off the business.  And how is she going to establish an

15     independent life from her mother and the business for purposes

16     of making sure that there is no collusion as we get ready --

17     as we proceed in this matter.

18          I mean she has substantial credit card debt.  They

19     borrowed from the TSP retirement.  They're making, what I

20     would consider to be an appreciably good amount of money, but

21     they spend $1400 a month, according to the Pretrial Services

22     report, in restaurant dining.

23          We need to be able to ensure that she's going to be

24     here.  We need to be able to ensure that any funds that are

25     posted are separate and distinct from her parents funds.  And

1    we need to be in a position to -- she herself has acknowledged

2    that she has ties to Mexico in the form of an uncle and a

3    cousin that she's very close to.

4                    THE COURT:  Mr. Duarte --

5              MS. PROFIT:  That's sort of not answering the

6    question, but that's what the Government sees as significant

7    hurdles to be overcomes in this case.

8              And I don't think that the Pretrial Services

9    recommendation, which is a $75,000 bond with a $5,000 cash

10   deposit, addresses it.

11                  THE COURT:  Ms. Profit, I didn't mean to cut you

12   off.  Anything else?

13             MS. PROFIT:  No, Your Honor.

14                  THE COURT:  Mr. Duarte.

15                  MR. DUARTE:  Your Honor, may it please the Court.  I

16   have looked at the Pretrial Services report and I was a party

17   to the investigation.  In other words I was allowed to be

18   present when she was interviewed.

19             Number one.  My client at page 3 of 5 says, has a

20   cousin in Baha, California, and an uncle.  And she has not

21   seen those individuals in over 20 years, even though she

22   speaks with them by telephone.  In fact, she only speaks with

23   the cousin on occasion.  I don't know how that presents a

24   problem for the Government as opposed to Ms. Pena that was

25   actually living in Mexico this past year and is out on bond.

1    That's number one with the areas that --

2         THE COURT:  Mr. Duarte, Mr. Duarte, I want to

3    address something here.  I can't speak for anybody else.  But

4    when I make a bond determination I just look at the facts and

5    circumstances of that individual and what's presented here.  I

6    want to ask you that you basically focus your arguments in

7    regards to your client here.  What may or may not have

8    happened in another case, as I'm concerned, at this time is

9    not relevant unless there's direct connection in that regard.

10        I do know there is probably going to be an issue of

11   residence, where she's going to reside, and whether or not if

12   bond is set, having contact with her mother as these

13   proceedings go forward.  But whether or not somebody else get

14   bond, from everything I have before me, I don't see how that's

15   relevant to whether or not Ms. Suprise should get bond.

16        MR. DUARTE:  Understood, Judge.  The only point I'm

17   making is, she really has not contact with Mexico, does not

18   travel to Mexico, hasn't been in Mexico, I believe for over 16

19   years, and she's been married for 16 years.

20        She is a lifelong resident of Hidalgo County.  She

21   is a happily married woman of 16 years to Victor Soliz, who is

22   here present electronically, and he can support his wife.

23   Period.

24        Now, the issue of where she lives is certainly an

25   issue.  And this is all directly related, Judge.  And we have

1    Maria Estela Suprise who lives across the street and is out on
2    bond, but she is living with her husband, a third-party
3    custodian, I think.  I hope I have that right.

4         Across the street or down the street, my client
5    lives in her own home with her husband in a house that is
6    legally owned by her parents.  There's no mortgage to pay,
7    there's no lien on it that my client has to go pay her mother
8    or father or anything like that.  I think it is reasonably
9    safe for my client to go home and live with her husband and
10   her two children in the residence.  So that is, in terms of
11   where she lives.

12        I do have a couple of issues there, Judge.  Number
13   one, my client is a U.S. Border Patrol Officer, and he has
14   removed all of his firearms and his -- I think he had three
15   bows with accompanying arrows.  So all of those items are
16   gone.

17        But he has two service revolvers that he keeps in a
18   safe when he is at home and he is the only person that has the
19   keys or the combination to that safe.  My client has no
20   ability to get to those service weapons.  That's an issue that
21   I know the Court needs to looks at.

22        I would ask, and it's my understanding, that the
23   Court can order the home inspection be conducted by video so
24   that can be accelerated in terms of time.  What I understand
25   that's a procedure that in your District that's a possibility,

1    so I would ask for that.

2          In terms of employment.  The business that we're

3    talking about has been co-mingled with other businesses.  And

4    I don't know what to do with that.  We have the retail

5    business downstairs where my client worked and doesn't need to

6    see her mother, and her mother doesn't have to go to the

7    building, and her mother doesn't have to be involved in

8    anything because Ms. Suprise's father should be able to

9    address those issues and keep the business going in a legal

10   manner selling legal products.

11         But it is a tough deal to kill the dog just to get

12   rid of the flea.  They have, I think, $600,000 worth of

13   alleged drug proceeds that have affected a $9 million per year

14   enterprise.  And that the business needs to run.  The

15   employees need some place to work.  My client is a manager and

16   I would ask that she be allowed to work there so long as her

17   mother is not involved in her business.

18         My client is happy to surrender her passport.  She

19   doesn't travel very much to begin with.  The last trip was to

20   Costa Rica on a trip with her family.  And I would ask that

21   she be allowed to travel outside of the Southern District of

22   Texas for the purpose of coming to see her attorney and

23   consulting with me.

24         The remaining issues in the report, I think they're

25   okay.  However, we would like my client to live with her two

1    children and her husband in her residence.  I think it is easy

2    to say that Maria Estela Suprise cannot go to my client's

3    residence and I think she has been ordered not to be in

4    contact with any co-defendants anyway.  So I don't think

5    technically that should be a problem.

6         It is my understanding that General Order 2020-20

7    permits Your Honor to sign the conditions of bond for her, and

8    my client will agree that Your Honor can sign the conditions

9    of bond on her behalf in order to avoid any delays.

10        I really don't think that my client poses much of a

11   danger to the community in terms of what's in the report.  If

12   what I hear is that my client on occasion allegedly held money

13   for her mom or gave money to her mother that her mother said,

14   hold this.  If that is the full extent, because she's out on

15   bond, living a normal life and not dealing with who we now

16   know is a suspected drug trafficker and money laundering

17   person by the Government, it should be relatively easy that

18   she is not a risk to this community.  I think that's the sum

19   of my argument, Your Honor.

20        THE COURT:  Ms. Profit, in regard to the two

21   residences.  And I don't know the exact residence for the co-

22   defendant mother.  Is it on the same property or is it like on

23   the same street and the two houses are just on the same

24   street?  Or maybe Agent Yates can clarify that if necessary.

25   Ms. Profit.

1          MS. PROFIT:  I think that Agent Yates can clarify

2     it.  My understanding is that it is on the same property and

3     that they about each other.  But Special Agent Yates can

4     clarify that.

5          THE COURT:  Agent Yates, hold on one moment.  Let me

6     remind you, you are still under oath.  And so, let me just ask

7     the question again so it's clear.

8          The issue is the residence for the co-defendant, Ms.

9     Maria Suprise and the residence for Daisy Suprise, what are

10    the location -- where are they located and how are they

11    located in respect to each other.

12         THE WITNESS:  Yes, Your Honor.  They're located on

13    two separate streets, but the properties run together.  They

14    go back-to-back, they share a fence line and the fence line

15    actually has a gate that allows them to travel from back yard

16    to back yard.

17         THE COURT:  So basically -- if I understand your

18    testimony, the back yard is basically where they connect; is

19    that correct?

20         THE WITNESS:  That is correct, Your Honor.

21         THE COURT:  And outside of that fence line, is there

22    any other connection?

23         THE WITNESS:  No, sir.  They have to go back onto

24    the street, but there is a gate on the fence allowing them to

25    go from property to property.

1        THE COURT:  Agent Yates, thank you for that

2   clarification.

3        Ms. Profit, I don't know if you have anything

4   further to add in regards to your argument.

5        MS. PROFIT:  Yes, Your Honor.  I mean the concern

6   that the Government has is that Mr. Duarte has mentioned that

7   the husband can support the wife.  But the husband, with all

8   due respect, has not been supporting the wife.

9        The residence belongs to the parents, they have

10  substantial credit card debt, they have a loan against the

11  TSP.  Everything that they have comes from the parents, and

12  that's a problem in this particular situation.

13       My understanding is, when you look at the Pretrial

14  Services report you have a 2021 Porsche SUV lease of $600 a

15  month.  That is for their 16-year old daughter, Your Honor,

16  that was a gift for Valentine's Day or her Quinceanera.  And

17  there was a 15 -- according to the lease agreement, a $15,000

18  down payment for that.

19       They have an extremely extravagant lifestyle that

20  has been supported by South Texas Beauty Supply and supported

21  by the parents.  And so we're in a situation where -- that

22  they are going to have to continue to looking to the parents

23  for that support, and they haven't come up with any other

24  plan, other than they can continue to live somewhere where

25  they're living rent free because it's owned by the parents.

1    The mother whom is a co-conspirator.

2              THE COURT:  Ms. Profit, just so I understand, you

3    know, looking at the facts and circumstances of the individual

4    background is something under the Bail Reform Act.  The usual

5    focus is obviously flight risk and/or danger to community.

6              I understand your argument that financially they may

7    be in a different situation than they were, the family, that

8    is Ms. Daisy Suprise and her husband, before they were

9    arrested and before Ms. Maria Suprise was arrested.  But how

10   does that relate to either flight risk or danger to the

11   community?  I mean, from everything you've said and if true,

12   they, obviously would need to make some changes in their

13   lifestyle, but I don't know how that affects flight risk.

14             MS. PROFIT:  What the Government is concerned about

15   is collusion.  Not only flight risk but collusion, in the

16   sense of Daisy Suprise being beholding to her parents, so that

17   this affects how she looks at this particular case.  That's

18   what the Government is concerned about and we believe that she

19   becomes a flight risk when she can no longer maintain the

20   style of living that she has here.

21             We also think that for purposes of the Court's

22   determination, one of the things that you look at is whether

23   or not you can rely on an individual to make appearances to

24   court, whether they are a responsible individual.

25             In looking at this Pretrial Services report, with

1    the amount of debts that these individuals have accumulated

2    while receiving a fairly substantial income, would make the

3    Government -- would make the argument that they are not

4    financially responsible and ergo are not sufficiently

5    responsible for the Court to rely upon them to appear.

6              I mean there's a whole bunch of -- looking at this,

7    there's a whole bunch of red flags in terms of financial

8    responsibility.  I mean, I don't know how you -- a combined

9    income of $100,000 a year and still have $13,000 in credit

10   card debt and still have to borrow against your TSP.

11             THE COURT:  Mr. Duarte, your response?

12             MR. DUARTE:  Yes, Judge.  It really is pretty

13   simple.  My client and her husband have been very fortunate,

14   and if you look at page 4 of 5 you will see that there is a

15   substantial amount that is paid every month, and it goes up

16   even more during the summer months when we look at the

17   children's sports, training and equipment.

18             I wasn't so fortunate, but these folks have children

19   who are particularly gifted in sports and they get to play in

20   those private leagues.  They get to travel all over the place

21   and you go -- you know, I'm not, again, lucky enough to

22   participate in a camp that shows you how to be recruited for

23   college sports scholarships.  But such things exist.

24             Well, all of those things cost money.  And you're

25   right, they will need to make some adjustments to their

1     budget.  But that's pretty much how they got here.

2            And when you talk about restaurant dining of 1400 a

3     month, a large part of that is when you take your children

4     every weekend to a softball tournament or a volleyball

5     tournament or a soccer tournament, you spend that kind of

6     money at the hotels and you spend it at the camps and you

7     spend it at the restaurants.

8            Again, these are people who may have to make

9     adjustments to their lifestyle.  But the fact that someone has

10    money or doesn't have money, shouldn't really affect their,

11    one, being a flight risk or, two, being a danger to the

12    community.

13           How is this person -- if she says she's got no

14    money, how is she supposed to run away with her two daughters

15    and her Border Patrol husband?  It's not going to happen.  She

16    is going to show up for court.  The reality is, she's going to

17    show up for court, she's going to honor her commitment to the

18    Court and, you know, the assets that she has, they may not be

19    large in terms of some folks, but they're much better than

20    many other people.  And so, if she has a ranch that is valued

21    at $900,000 and the Government wants to collect, I don't know,

22    $50,000 because she ran away, I don't even think we need a co-

23    surety here.

24           But how much money someone has really does not

25    affect whether someone is a flight risk, one, or two, a danger

1    to the community.  No matter how much money she gets from her

2    parents, she's going to show up.  No matter how little she

3    gets from her parents, she's going to show up.

4              Again, this is no different than, in fact, many drug

5    cases.  How many times do we have brothers and sisters and

6    fathers and mothers that get indicted in the same case.  I'm

7    here to represent her and I am going to tell her what the

8    facts of her case are, the strengths of it, and she will deal

9    with this based on independent counsel.

10             And the Government keeps stepping in trying to

11   suggest that I do not have the ability to properly educate and

12   advise my client about this system and the process and what

13   she's looking at.

14             MS. PROFIT:  Your Honor, if I may --

15             THE COURT:  Ms. Profit, I understand there's been

16   some sidebar remarks as we've gone through the hearing.  But

17   let's just focus while we're here in regards to whether or not

18   bond should be set.

19             Do you have any further rebuttal argument on that,

20   Ms. Profit?

21             MS. PROFIT:  Yes, Your Honor.  When we talk in terms

22   of danger to the community we're ignoring the fact that many

23   of these funds, if not all of these funds, have been derived

24   from income that has been laundered through the business by

25   drug traffickers.

1          We certainly know that there was 40 kilograms of

2    methamphetamine involved in one of the undercover -- the

3    proceeds from one of the undercover.  We'd like to think of --

4    people like to think of money laundering as being divorced,

5    money launderers as being divorced from drug traffickers, but

6    they're not.  They are the lifeblood of drug trafficking

7    because without the willingness of the money launderers, there

8    would be no profit motive in drug trafficking.  And I just

9    want to point that out from a danger to the community

10   perspective.

11         THE COURT:  Ms. Suprise, at this time I'm going to

12   address you under the Bail Reform Act the various facts and

13   circumstances I need to take into consideration to determine

14   whether or not bail or bond can be set.

15         As I advised you before there is nothing for you --

16   you do not need to say anything at this time.  If I make a

17   misstatement in regards to your personal background or

18   circumstance, please raise your hand.  And if you believe you

19   need to correct something here on the Record I'll give you a

20   moment to meet with Mr. Duarte in a breakout room and then

21   he'll be able to advocate on your behalf.

22         And again I said this here on the Record, because

23   usually sometimes, not all the time, but every now and then an

24   individual would like to speak up.  Your attorney is not next

25   to you at this time to advise you.  So just raise your hand if

58

1    you believe you need to talk to your attorney, and I will give

2    you that opportunity to speak with your attorney.

3           So under the Bail Reform Act from 1984 I am required

4    to take into consideration the facts and circumstances of the

5    case and I'll do so at this time.

6           You are charged in a conspiracy to launder drug

7    proceeds from, again, 2018 through 2019.  The facts and

8    circumstances have already been laid out here in regards to

9    the probable cause hearing.  Based on the information in the

10   criminal complaint substantial sums were involved.  What is

11   set forth in the complaint, again, are the totality of the

12   circumstances.  It does appear you're involved in connection

13   to that laundering of drug proceeds.

14          As noted by Government counsel, this is a very

15   serious offense.  Drug trafficking is a very -- unfortunately,

16   happens a lot of down here in South Texas and is a big problem

17   down here, and as Ms. Profit has pointed out on the Record,

18   the reason people traffic in drugs is because of the money

19   involved and the large amount of sums that are involved and

20   connected to it.  And, you know, without the money and

21   laundering there is really no drug trafficking.  There is no

22   financial incentive to do it.  So they are part and parcel,

23   they do go together.

24          This is a very serious offense that you're alleged

25   of, even though in connection to the allegations maybe you

1     never even touched the drugs or dealt with the drugs directly.

2             I will note, though, unlike a drug offense there is

3     no presumption of detention.  In regards to somebody arrested

4     for money laundering in connection to drug proceeds maybe that

5     presumption should be there, but Congress has not set that.

6     It's only in regard to the actual drug trafficking

7     transactions.

8             So I am going to take into consideration the facts

9     and circumstances of the case, the seriousness of the offense.

10    I will take into consideration your role in connection of the

11    role of the two co-defendants that I am aware of at this time,

12    being your mother, Ms. Maria Suprise and Ms. Yolanda Pena, and

13    make a determination whether bail or bond should be set.

14            I will note, even though I am allowed to take into

15    consideration these circumstances of the case, you are

16    presumed innocent at this time.  And as I note in regards to

17    probable cause hearing, there may be other facts and

18    circumstances that may affect the final outcome of the case.

19            But for the portion of the detention hearing I can

20    look at those facts and circumstances to determine if bail or

21    bond should be set.  Besides that, I'm also required to take

22    into consideration your personal background and any

23    circumstances.

24            In that regard I take judicial note of the pretrial

25    report.  I also take into consideration argument set forth by

1       Mr. Duarte on your behalf.

2               In regard to the pretrial report it does note you

3       are 39 years old, you are a United States citizen.  I do note

4       I've been advised, I believe your husband is a Border Patrol

5       Agent and he has been online throughout this hearing as well.

6               Basically you're a lifelong resident of McAllen,

7       Texas.  You're currently residing at a residence that is owned

8       by your mother but you don't live there with your mother, you

9       live there with your husband and your children.

10              It does note that there was a significant amount of

11      firearms, rifles, shotguns and three hunting bows, based on

12      the pretrial report and the announcement of Mr. Duarte, except

13      for maybe the service weapons connected to your husband's job,

14      I believe all those other weapons have been removed from the

15      residence.

16              You do have a brother who also lives here in

17      Mission, Texas.  As obviously has been dealt with directly on

18      the Record, your mother is a co-defendant, also lives here in

19      South Texas, and your father also lives here as well, and

20      looks like just right behind you, based on the testimony of

21      Agent Yates.

22              You've been married for 16 years, you do have two

23      children, ages 16 and 13, who are in the custody of your

24      husband at this time.

25              You do own a passport.  There has been some foreign

1   travel in the past to Costa Rica, four years ago as well as

2   the Bahamas six years ago.  It does note you have a material

3   uncle and cousin who reside in Mexico.

4           Ms. Suprise I'm losing connection here.  Just yes or

5   no, can you still hear the Court?

6           THE DEFENDANT:  Yes, Your Honor.

7           THE COURT:  And Mr. Duarte and Ms. Profit, can you

8   still hear the Court?

9           MS. PROFIT:  Yes, Your Honor.

10          MR. DUARTE:  Yes, Your Honor.

11          THE COURT:  So there is some foreign travel and some

12  connection to Mexico, as laid out here in the pretrial report.

13          In regards to your education and employment, it does

14  note being a lifelong resident here in McAllen, you have

15  graduated from McAllen Memorial High School in 2000.  You did

16  attend UT-Pan American for a couple semesters, but withdrew

17  and ended up working as a general manager, it says here for

18  three of the South Texas Beauty Supply locations in McAllen,

19  Harlingen and Laredo, all of which are owned by your parents.

20  It does note your annual income set forth in the report and

21  your expenses as well.

22          It does note your husband is a Border Patrol agent

23  for the past 19 years.  Your income from the 2020 Joint Tax

24  Income Return is set forth here in the report.  It does note

25  your assets and liabilities.  It does note your net worth as

1    determined by the pretrial officer.  I'll take that into

2    consideration as well.

3              All this information has been corroborated by your

4    husband in regards to your background, your education and your

5    employment status.

6              There is a reference about a ranch that was gifted

7    to your children by your parents.

8              No physical health issues of note.  No mental health

9    issues of note.  No substance abuse issues of note.  No prior

10   arrests or convictions that I am aware of.

11             There has been an argument presented by Government

12   counsel, that due to your connections to the business owned by

13   your parents the Government's belief that the business is

14   involved in extensive money laundering and your reliance on

15   your parents over the years, for the obvious example, the

16   residence you reside at belongs to your mom.  There is concern

17   for a flight risk should bail or bond be set in this matter.

18             But taking into consideration the fact that you are

19   a United States citizen, you are a lifelong resident of

20   McAllen, Texas, you have no prior arrests or convictions.  As

21   set forth in the report there's no drug abuse issues, no

22   mental health issues, as well as no substance abuse issues of

23   note.  You have had basically employment with your parents

24   business over the past 19 years.  It appears your husband also

25   has stable employment as well with Border Patrol.  Your kids

1     do reside and live here in McAllen, Texas, as well as your

2     immediate family.

3          Taking into consideration the role, as I'm aware of

4     it, based on the information in the criminal complaint, taking

5     all those factors into consideration I do believe there is a

6     condition or combination of conditions that can be set to

7     assure your appearance as well as safety to the community.

8          Bond is going to be as following:  It is going to be

9     a $75,000 bond.  I am going to require a deposit of 10

10    percent, $7,500.  I am going to require a suitable co-surety

11    that needs to be approved by the Court as well as a third-

12    party custodian.

13         Mr. Duarte, in regards to meeting these conditions,

14    should there be a chance in the financial situation of your

15    client and these conditions are not met, you can file the

16    appropriate motion for reconsideration of these conditions.  I

17    do think they're appropriate at this time based on the

18    information I have before me to assure your client's

19    appearance as well as the safety to the community.

20         Ms. Suprise, the other conditions of release will be

21    as follows:  You must not violate Federal, State or local law

22    while on bond.  Pretrial supervision will be here in the

23    McAllen, Texas.  You may need to maintain or actively seek

24    employment.  I am going to have to address that in a moment.

25    I do not know if it's appropriate for you at this time to go

1    back working for South Tex Beauty Supply Company, considering

2    the allegations contained in the criminal complaint and the

3    testimony here from the agent this afternoon.

4          No travel outside the Southern District of Texas

5    without permission of the Court.  No foreign travel, so no

6    travel to Mexico or any other country.  I will allow travel to

7    the Western District of Texas, San Antonio, to visit your

8    counsel in preparation or to meet with him in connection with

9    these proceedings.

10         In regard to that travel, I will advise that you

11   just need to advise your pretrial officer when you're leaving

12   to go to San Antonio, how long you're going to be there, and

13   when you come back you'll need to check in with your pretrial

14   officer.

15         Avoid all contact with the co-defendant, witness or

16   potential victims.  That includes your mother, Maria Suprise.

17   She is a co-defendant in this matter.  You cannot have any

18   contact with her.  Not only in person, telephone contact, also

19   includes third-party contact.  It would be real easy to maybe

20   to ask you son or daughter, how is your mom doing.  They may

21   mean nothing about it, they're just going to ask about their

22   grandmother.  They may have communication that way.  You

23   cannot have any of that contact at all.  If that contact comes

24   to the attention of the Court, that could lead to basically a

25   revocation of your release and you may be detained pending the

1   outcome of these proceedings.

2          You need to refrain from possessing a firearm,

3   destructive device or other dangerous weapons.  In a moment

4   I'll address the issue of your husband's service weapons in

5   connection to his employment with Border Patrol.

6          Refrain from any excessive use of alcohol, refrain

7   from use or unlawful possession of a narcotic drug or other

8   controlled substance unless prescribed by a licensed medical

9   practitioner.  Report within 72 hours to the Pretrial Service

10  Office, supervising officer, any contact with law enforcement

11  personnel, including but not limited to any arrest,

12  questioning or traffic stop.

13         Ms. Iglesias is in the courtroom with Pretrial.  I

14  guess I'll have to address those issues.  But for the

15  conditions I've laid out so far, any questions?

16         MS. IGLESIAS:  Her passport, Your Honor?

17         THE COURT:  The passport does need to be turned in.

18  I forgot to say that.  Passport needs to be formally

19  surrendered to the Pretrial Service Officer before you are

20  released out on bond.

21         Let me go ahead and take care of another procedural

22  matter at this time.  Now, let me remind you, Ms. Daisy

23  Suprise, you are still under oath.

24         Under General Order Number 2020-28, either counsel

25  or the Court can sign the bail bond paperwork on your behalf.

1   Once all these conditions are met you'll be brought back here

2   for a hearing.  I'm going to go ahead and handle the bond

3   release hearing in this case.  Usually you'd be in court,

4   you'd be able to sign the paperwork.  Obviously, that will not

5   be possible since you'll still be at the La Villa Detention

6   Center.  In lieu of that either your attorney or the Court can

7   sign the bond paperwork, but only upon your consent.

8           So Ms. Daisy Suprise, do you consent to allowing

9   either your attorney or the Court to sign the bond paperwork?

10          THE DEFENDANT:  I do, Your Honor.

11          THE COURT:  Mr. Duarte, do you agree to signing the

12  bond paperwork on behalf of your client?

13          MR. DUARTE:  Your Honor, because I'm in San Antonio,

14  I would prefer the Court sign on behalf of my client, please.

15          THE COURT:  I'll do it this way, Mr. Duarte.  I have

16  allowed electronic signatures.  Obviously, unfortunately

17  because of COVID we've become very adapt on sending documents

18  back and forth, having attorneys not even having to come to

19  the courthouse to sign the paperwork on behalf of their

20  client.

21          My preference is to always have the attorney sign on

22  behalf of their client, and Mr. Duarte, if for some reason

23  that cannot happen, between communication between the Clerk's

24  Office and your office, then obviously I'll be able to sign

25  the paperwork on behalf of your client.  But again, I believe

1    the procedures will be laid out where you'll be able to sign

2    the bond paperwork and everything will be able to transmit

3    between the Court and your office in San Antonio without any

4    issues.  Consent has been given here on the Record.

5           The issues I haven't dealt with regards to the

6    conditions is the issue of employment and employment at South

7    Tex Beauty Supply Company.

8           Based on the information set out here by Agent Yates

9    in connection with the investigation, Mr. Duarte I do

10    understand your argument about obviously it's a beauty supply

11    company and you made an argument there of, you know, how much

12    is it connected to the legitimate business versus how much can

13    the Government can show is connected to money laundering.

14           But considering the facts and circumstances of the

15    allegations and the testimony of the agent here, I think at

16    this stage it is appropriate to say that at this time Ms.

17    Daisy Suprise cannot work at South Tex Beauty Supply Company.

18    This may change depending on how the prosecution goes forward.

19    But at this point she cannot go back to that employment at

20    this stage.

21           Again, I do understand your argument, Mr. Duarte,

22    and I think some of that argument is more relevant should this

23    case go to trial, versus a preliminary detention hearing.  But

24    it does appear the business is involved with a substantial

25    amount of money laundering.  I do understand the evidence may

1    show otherwise.  I do understand your argument in regards to
2    there is a legitimate reason for the business.  But on
3    everything I've set forth here today I think it is appropriate
4    that at this time she cannot be employed by her father at the
5    business as a condition of bond.
6         In regards to the firearms.  This is a more delicate
7    issue.  I don't have any information here of any mental health
8    issues that would bring me any concern about having the
9    firearms at the residence.
10        The husband, Mr. Soliz, obviously is a Border Patrol
11   Agent.  He does have his service weapons.  My understanding,
12   those service weapons cannot be left out in the vehicle, they
13   need to be secured in the residence when he gets home from
14   work, for all the obvious reasons, where they should be
15   secured at the residence while he's off duty.
16        Ms. Profit, based on the information I have before
17   me, you know, I don't have -- I can't think of a reason why I
18   should not allow him to at least secure his weapons there in
19   the safe at the residence at this time.  I don't know if the
20   Government had anything they want to address in regards to
21   that point.
22        MS. PROFIT:  At this point, no, Your Honor.  Though
23   my understanding, based on Mr. Duarte's representation was --
24   Mr. Soliz could confirm, is that they are kept secure in a
25   safe and he's the only individual with access to that safe and

1    if he needs to enter the safe the password or whatever.  I'd

2    just like to confirm that.

3            THE COURT:  Mr. Duarte, actually I was going to ask

4    you the same.  What is your understanding in regards to the

5    safe at the residence for Mr. Soliz's firearms in connection

6    to his Border Patrol employment?

7            MR. DUARTE:  Yes, sir.  It is my understanding, and

8    I did interview Mr. Soliz on this specific point.  He tells me

9    neither his wife nor his children have any way of getting into

10   that safe.  He is the only person with access to the safe.  He

11   is the only person that knows how to get into it.  And he is

12   present today, Judge.

13           THE COURT:  So I do note he has been here throughout

14   the hearing.  I still believe he is online at this time.

15           So I am going to allow -- no firearms are allowed in

16   the residence, destructive device or other dangerous weapons

17   except for the service weapons belonging to Mr. Soliz in

18   connection to this employment for Border Patrol.  Obviously

19   the need to be locked in the secure lockbox or locker he may

20   have at his residence to secure the weapons when he's not

21   working for Border Patrol, when he's off duty at the

22   residence.

23           Mr. Duarte, I'm going to ask Mr. Soliz to execute an

24   affidavit in regards to what you've just said here on the

25   Record, and if that affidavit could be submitted to Pretrial

1    Services in connection with meeting these conditions, in

2    regards that he is the only one that has access to the safe

3    and is the only one that has a key to the safe in regard to

4    the firearms.

5              MR. DUARTE:  I'll prepare that, Your Honor.

6              THE COURT:  And again, I don't believe that there's

7    anything -- I think it's appropriate, considering his

8    employment, and there is nothing on the Record that would

9    caution against allowing him to keeping his firearm there

10   while his wife is on pretrial release.

11             I did forget to add.  The residence does need to be

12   checked for -- basically make sure it's suitable for somebody

13   on pretrial release.  My educated guess is more likely than

14   not it is, as Mr. Duarte mentioned earlier, that can be done

15   through a video through coordination through pretrial.  And

16   Mr. Soliz, or another family member if necessary in regards to

17   checking the residence out.

18             Ms. Iglesias, I believe that should take care of all

19   the conditions?  I just want to make sure.

20             MS. IGLESIAS:  Yes, Your Honor.

21             THE COURT:  Before I give the final admonishments in

22   regard to this hearing, Ms. Profit, anything else on behalf of

23   the Government?

24             MS. PROFIT:  No, Your Honor.

25             THE COURT:  Mr. Duarte, anything on behalf of your

1    client, Ms. Daisy Suprise?

2              MR. DUARTE:  Yes, Your Honor.  Since he is on the

3    line, if you will, right now, I would ask if the Court would

4    approve Victor Soliz as the co-surety for his wife.

5              THE COURT:  In regards to that affidavit, pretrial

6    can provide him the application and he can formally complete

7    the application and that will be provided to me for review,

8    along with the affidavit, similar to our usual procedures in

9    that regard.

10              MR. DUARTE:  Yes, Your Honor.

11              THE COURT:  If he doesn't have the paperwork,

12    pretrial will get the paperwork for him and to complete.  I

13    presume he's obviously down here in McAllen or Mission.  And

14    he'll be able to complete that, if not by today, by tomorrow,

15    for the Court's approval.

16              MR. DUARTE:  Yes, sir.  The other issue, Judge, is I

17    just want to be clear.  I know who the two co-defendants are.

18    I do not know who witnesses are, but the Court does not want

19    my client near potential defendants.  She has a sister.  I

20    don't know that her brother, Rene, is a potential defendant in

21    any way.  Hopefully she would be allowed to see her brother.

22              I do not know that Mr. Suprise, her father, is a

23    potential defendant and I'd hope that she'd be allowed to see

24    him, but I'd like that clarified before I let her out to do

25    anything.

1          MS. PROFIT:  Your Honor, I resent Mr. Duarte fishing

2     for information.

3          MR. DUARTE:  It's just her brother and her father.

4     Can she see them, yes or no, is all I'm asking.

5          THE COURT:  Mr. Duarte, let me address this matter.

6     Based on the information I have before me in each of these

7     criminal complaints, there are three defendants; Maria

8     Suprise, Yolanda Pena, as well as your client.  The

9     individuals she cannot have contact with is Yolanda Pena as

10    well as her mother.

11         In regards to complaints that have been presented

12    before me, I am not aware of the father being involved, I'm

13    not even aware of her brother being involved at this time.

14         Ms. Profit, your resentment aside, I don't know if

15    the Government had anything else to say in regard to that.

16         MS. PROFIT:  Your Honor, the Government is not going

17    to say anything at this time.

18         THE COURT:  So basically, and again I want to review

19    this with your client here today as well again at the bond

20    release.  But the co-defendants as listed are again the

21    individuals just identified.  So as far as witnesses,

22    potential victims, in that regard the witnesses I can see here

23    would be other employees at the business that she should not

24    have any contact with.  It does seem like other employees were

25    involved, just based on the criminal complaint, and were aware

1    of what was going on.  She cannot have any contact with them

2    in that regard.  But based on the information I have, besides

3    that, I think that should cover everything and who she cannot

4    have contact with at this time.

5              MR. DUARTE:  Thank you, sir.

6              THE COURT:  Ms. Suprise, I need to address you

7    directly at this time in regards to being released on bond.

8              Failing to appear in court as required is a crime

9    for which you can be sentenced to imprisonment.  In other

10   words, you make all your court appearances.  If you fail to

11   make any of your court appearances, the prosecutor can file a

12   charge against you for failure to appear.  It's not that hard

13   to prove based on proof beyond a reasonable doubt.  So whether

14   they're in person or the video conference, attend court when

15   required.

16             If you violate any condition of release, a warrant

17   for arrest may be issued and you may be jailed until trial and

18   also be prosecuted for contempt of court.

19             Committing crime on release may lead to more severe

20   punishment than you would receive for committing the same

21   crime at any other time.  Should you commit any offense, even

22   a traffic violation or a misdemeanor offense, should this case

23   end up in a sentencing before a District Judge, that District

24   Judge can take that into consideration.  You could be looking

25   at more time in jail or prison.

1          It is a crime to try to influence a juror, or

2     threaten or attempt to bribe a witness or other person who may

3     have information about this case, to retaliate against anyone

4     providing information about the case or to otherwise obstruct

5     the administration of justice.

6          In other words, again, you cannot have contact with

7     any co-defendants, witnesses, or potential victims, in person,

8     telephone, social media, third-party contact.  The only person

9     you can talk to about this case as these proceedings go

10    forward is essentially, Mr. Duarte, any staff or investigator

11    who may work with him in his office.

12         Should anybody ever reach out to you in regards to

13    these proceedings, I would advise you to follow up with Mr.

14    Duarte and he would tell you how to proceed forward should

15    that happen.

16         Should it come about that you're trying to contact

17    co-defendants, potential witnesses who may work at South Texas

18    Beauty Supply Company in this matter, that could lead to

19    additional charges being filed against you by the Federal

20    Government and including, basically trying to tamper the

21    investigation, somehow obstruct the administration of justice

22    as these proceedings go forward.

23         The final admonishment I need to give this

24    afternoon, Ms. Suprise, with you here in the courtroom through

25    the video conference with Ms. Profit online as well as Mr.

1    Duarte online, let me advise the following:

2            In accordance with the Federal Rules of Criminal

3    Procedure 5(f) as recently amended by the Due Process

4    Protection Act, from October 21st of last year and signed by

5    President Trump, the Government is hereby notified of an order

6    to comply with the prosecutor's disclosure obligations under

7    *Brady v. Maryland*, a Supreme Court case from 1963 and related

8    case law since 1963.

9            A failure to comply with these disclosed obligations

10   can lead to sanctions against the Government, such as a delay

11   of trial of the proceedings, the exclusion of evidence, to

12   give an adverse jury instruction, the granting of a new trial,

13   the dismissal of an action or finding of contempt of court.

14           In other words, Ms. Suprise, under *Brady v. Maryland*

15   the Government is obliged to produce through discovery any

16   exculpatory evidence.  Evidence that would show you're not

17   guilty of the allegations in the criminal complaint, or any

18   impeachment evidence.  Evidence that could be used to cross

19   examine someone who may testify against you.  Failure to do so

20   can lead to the noted sanctions.

21           There is actually no order needed for the Government

22   to comply with these disclosed obligations.  However, to

23   comply with the change of law, an order setting forth this

24   admonishment will be placed in file in this matter.

25           Ms. Profit, anything further for today's hearing?

1          MS. PROFIT:  No, Your Honor.

2          THE COURT:  Mr. Duarte, anything further, any

3     questions regarding the conditions of release before I

4     conclude this afternoon's hearing?

5          MR. DUARTE:  I do not believe so, Your Honor.

6          THE COURT:  Ms. Suprise, one last thing I need to

7     advise you of.  It will probably take a couple of days, maybe

8     even up for a week for all these conditions to be met.  You

9     are going to be detained.  And again, once these conditions

10    are met we'll bring you over here for a formal bail/bond

11    release hearing.  Until then you are remanded to custody of

12    the Marshals.

13         THE DEFENDANT:  Thank you, Your Honor.

14       (Defendant remanded.)

15         THE COURT:  All parties are excused for this

16    afternoon's hearing.  Thank you for your attendance.

17         MS. PROFIT:  Thank you, Your Honor.

18         MR. DUARTE:  Thank you, Your Honor.

19       (Proceedings adjourned at 5:09 p.m.)

20

21

22

23

24

25                    *  *  *  *  *

1          *I certify that the foregoing is a correct transcript*

2     *to the best of my ability due to the condition of the*

3     *electronic sound recording of the ZOOM/telephonic proceedings*

4     *in the above-entitled matter.*

5       */S./   MARY D. HENRY*

6     *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

7     *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

8     *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

9     *JTT TRANSCRIPT #63685*

10    *DATE FILED:  APRIL 26, 2021*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25